UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
ARCADIA BIOSCIENCES, INC.,          :
                                    :
          Plaintiff,                :  .
                                    :
     -v-                            :
                                    :
VILMORIN & CIE, LIMAGRAIN CEREALES  :
INGREDIENTS SA, and ARISTA CEREAL   :
TECHNOLOGIES PTY LIMITED,           :
                                    :
          Defendants.               :
-----------------------------------x

SDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FI

18-cv-8059 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

Contrary to popular superstition, there is no such thing as "natural" wheat, as farmers have been selectively breeding this staple since Neolithic times. But something of a race is now on to see who can develop genetically modified wheat with health benefits and commercial advantages. The instant case, arising from that competition, involves an international patent dispute over just such modified wheat. Specifically, plaintiff Arcadia Biosciences, Inc. ("Arcadia") alleges that it invented a kind of genetically modified wheat that has various health benefits and that, in the hope of fostering its commercial development, it shared this invention with defendants - who also develop agricultural products - in a series of meetings that were protected by a nondisclosure agreement. Defendants then allegedly used the information Arcadia shared, in violation of

1

the nondisclosure agreement, to file three patents and develop other product lines. Arcadia now brings federal patent claims for correction of inventorship, as well as a welter of state contract and tort claims.

On September 4, 2018, Arcadia filed its initial complaint against defendants Vilmorin & Cie ("Vilmorin"), Limagrain Céréales Ingrédients SA ("LCI"), and Arista Cereal Technologies Pty Limited ("Arista"). ECF No. 1. On October 17, Arista moved to dismiss Arcadia's complaint for lack of personal jurisdiction, lack of subject matter jurisdiction, and failure to state a claim. ECF No. 23. On the same day, Vilmorin and LCI moved jointly to dismiss Arcadia's complaint for failure to state a claim. ECF No. 27. On October 26, Arcadia filed its First Amended Complaint ("FAC"), ECF No. 33, and on November 5, defendants filed supplemental briefs in support of their motions to dismiss, ECF Nos. 36, 37, which Arcadia opposed, ECF Nos. 40, 42.

After receiving full briefing from the respective parties, the Court held oral argument on January 7, 2019. Thereafter, upon careful consideration, the Court issued a "bottom-line" Order on January 11. ECF No. 53. The Order granted Arista's motion to dismiss for lack of personal jurisdiction, and it dismissed all of Arcadia's claims against Arista without

2

prejudice. The Order also granted Vilmorin and LCI's motion to dismiss for failure to state a claim, and it dismissed all of Arcadia's claims against Vilmorin and LCI with prejudice. This Opinion sets forth the reasons for the Court's rulings and directs the Clerk of Court to enter final judgment dismissing the FAC.

## Background

The following factual allegations are taken from the FAC and any documents incorporated there by reference. They are viewed in the light most favorable to Arcadia:

Arcadia is a Delaware corporation with its principal place of business in California. FAC ¶ 2, ECF No. 33. "Arcadia's business is the development of agricultural products, including crops with enhanced productivity and quality traits." Id. Defendant Vilmorin is a French company that, among other things, is "involved, either directly or indirectly through its affiliates[,] in . . . researching, developing, and breeding plants." Id. ¶ 41. Defendant LCI is a French company that, along with Vilmorin, is a wholly owned subsidiary of Groupe Limagrain Holding SA. Id. ¶ 4. Defendant Arista is an Australian joint venture that was formed in 2006 by LCI and two Australian entities. Id. ¶ 5. At present, LCI has a majority interest in Arista. Id. ¶ 6.

3

In 2006, scientists at Arcadia began researching and developing a high amylose wheat technology. Id. ¶ 13. Amylose is one of two components of starch that — along with amylopectin — is present in the endosperm of wheat grains. Id. ¶ 22. Amylose is digested more slowly than amylopectin, thereby giving rise to various health benefits. Id. ¶¶ 22-23. To promote these benefits, scientists at Arcadia conceived of, and reduced to practice, genetic mutations of wheat grain with high amylose-to-amylopectin ratios. See id. ¶¶ 37-38.

Specifically, Arcadia's scientists caused mutations in a bread wheat gene called the SBEIIa gene, which produces a protein product that helps form amylopectin. Id. ¶ 35. Bread wheat has three genomes — A, B, and D — each of which has an SBEIIa gene — SBEIIa-A, SBEIIa-B, and SBEIIa-D - with two copies. Id. ¶ 34. By mutating each copy of the SBEIIa-A, SBEIIa-B, and SBEIIa-D genes so that they lost their protein-producing function, Arcadia was able to reduce the amount of amylopectin produced in the grain's endosperm, thereby increasing the amylose-to-amylopectin ratio. Id. ¶¶ 35-36.

On November 13, 2009 — after it had reduced its invention to practice — Arcadia entered into a Confidentiality and Nondisclosure Agreement ("NDA") with Vilmorin to promote potential collaborative opportunities between the parties. The

4

NDA is binding on both Vilmorin and its "affiliates," where
"affiliates" is defined to include "any existing or future
corporation, firm, limited liability company, partnership, or
other entity that directly or indirectly controls, or is
controlled by, or is under common control with" Vilmorin. NDA
§§ 1.1, 3.5, ECF No. 29, Ex. 1. Over the course of several
years, and under the protections of the NDA, Arcadia shared
details of its high amylose wheat technology with Vilmorin and
LCI employees, including Elisabeth Marie-Anne Ida Chanliaud, who
was employed by Vilmorin or LCI but is described in the FAC as
an "Arista Project Manager." FAC ¶¶ 14, 55.

Between 2011 and 2013, Arista filed three U.S. patent
applications that later issued as patents. Id. ¶ 15. The first
application, the '884 Application, was filed on November 4, 2011
and issued on June 23, 2015 as a patent — the '533 Patent —
entitled "High Amylose Wheat." Id. The second application, the
'177 Application, was filed on November 2, 2012 and issued on
June 7, 2016 as a patent — the '722 Patent — entitled "High
Amylose Wheat-II." Id. The third application, the '456
Application, was filed on August 6, 2013 and issued on March 7,
2017 as a patent — the '413 Patent — entitled "Food Ingredients
Produced from High Amylose Wheat." Id. All three patents were
assigned to Arista and were issued to Ahmed Regina, Pierre

5

Georges Louis Berbezy, Elisabeth Marie-Anne Ida Chanliaud, Bernard Duperrier, and Matthew Kennedy Morell. Id.

Arcadia alleges that some of the information it disclosed under the protections of the NDA is claimed in Arista's patents. Id. ¶ 59. Arcadia also alleges that other information it disclosed under the protections of the NDA, while not claimed in Arista's patents, is nevertheless likely being misused and misappropriated by defendants. Id. According to Arcadia, Arista made clear in a provisional patent application filed on November 4, 2010 — the '288 Provisional — that it had been unable to obtain a viable version of the mutated wheat grain that Arcadia had succeeded in developing. Id. ¶ 61. Arcadia alleges that Arista was able to overcome its failures only because of the confidential information that Arcadia disclosed to defendants. Id.

By filing Arista's patent applications, Arcadia alleges, defendants breached their obligations under the NDA. Id. ¶ 88. Furthermore, Arcadia alleges, by obtaining Arista's patents in violation of Arcadia's rights, and by using those improperly obtained patents, defendants have unfairly competed against and interfered with Arcadia. Id. ¶ 92. As a result, Arcadia alleges, "Defendants have injured and tarnished Arcadia's business,

reputation, brand, and goodwill, and thereby have undermined and damaged Arcadia's business through improper conduct." Id. ¶ 96.

On September 4, 2018, Arcadia filed its initial complaint against Arista, Vilmorin, and LCI, ECF No. 1, and on October 26, Arcadia filed the FAC, ECF No. 33. In the FAC, Arcadia brings federal patent claims against Arista for correction of inventorship of the '533, '722, and '413 Patents. FAC ¶¶ 102-10, 175-83. Arcadia also brings state law claims against all defendants for breach of contract, breach of the implied covenant of good faith and fair dealing, unfair competition, misappropriation of confidential information, unjust enrichment, conversion, and tortious interference. Id. ¶¶ 111-74.

On October 17, Arista moved to dismiss Arcadia's initial compliant for lack of personal jurisdiction, lack of subject matter jurisdiction, and failure to state a claim. ECF No. 23. On the same day, Vilmorin and LCI jointly moved to dismiss for failure to state a claim. ECF No. 27. On November 5 - after Arcadia filed the FAC - the defendants filed supplemental letter briefs in support of their motions to dismiss. ECF Nos. 36, 37. Arcadia opposed. ECF Nos. 40, 42. For the following reasons, Arista's motion to dismiss for lack of personal jurisdiction is

granted,[1] as is Vilmorin and LCI's motion to dismiss for failure
to state a claim.

## Discussion

## I. Arista's Motion to Dismiss for Lack of Personal Jurisdiction

Arista moves to dismiss the FAC under Rule 12(b)(2) of the
Federal Rules of Civil Procedure. "On a Rule 12(b)(2) motion,
plaintiff carries the burden of demonstrating that jurisdiction
exists, and where the district court did not conduct a full-
blown evidentiary hearing on a motion, the plaintiff need make
only a prima facie showing of jurisdiction." Penachio v.
Benedict, 461 F. App'x 4, 5 (2d Cir. 2012).[2] In deciding a Rule
12(b)(2) motion, the Court will "construe the pleadings and
affidavits in the light most favorable to [the plaintiff],
resolving all doubts in [its] favor." DiStefano v. Carozzi N.
Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001).

In patent cases, district courts tend to apply Federal
Circuit law when deciding questions of personal jurisdiction.

---

[1] Because the Court finds that it lacks personal jurisdiction
over Arista, it does not address Arista's motions to dismiss for
lack of subject matter jurisdiction and failure to state a
claim.

[2] Unless otherwise indicated, in quoting cases all internal
quotation marks, alterations, emphases, footnotes, and citations
are omitted.

8

See, e.g., RegenLab USA LLC v. Estar Techs. Ltd., 335 F. Supp. 3d 526, 535-36 (S.D.N.Y. 2018); Rates Tech. Inc. v. Broadvox Holding Co., LLC, No. 13 Civ. 0152 (SAS), 2014 WL 46538, at *1 (S.D.N.Y. Jan. 6, 2014). However, "[t]he test for personal jurisdiction under the law of the Federal Circuit mirrors that of the one employed by the Court of Appeals for the Second Circuit." JetBlue Airways Corp. v. Helferich Patent Licensing, LLC, 960 F. Supp. 2d 383, 390 (E.D.N.Y. 2013). Under the law of both circuits, a court, in cases involving a non-consenting, out-of-state defendant, must ask first whether the defendant is subject to the forum state's long-arm statute, and second whether the exercise of personal jurisdiction would comport with due process. Hildebrand v. Steck Mfg. Co., 279 F.3d 1351, 1354 (Fed. Cir. 2002).

Arcadia alleges that the Court has jurisdiction over Arista on the sole basis that the NDA between Arcadia and Vilmorin contains a mandatory New York forum selection clause. FAC ¶ 11; NDA § 7 ("Any legal action which may be brought to enforce any provision of this Agreement, or which may arise from or be related to this Agreement, shall be brought in a state or federal court of competent jurisdiction in the State of New York."). But Arista is not a party to the NDA. Nevertheless, Arcadia argues that Arista is bound by the forum selection

9

clause because the NDA provides that "all [Vilmorin's] Affiliates shall be deemed to have assented to the terms and conditions of this Agreement notwithstanding the lack of any additional written agreement to that effect." NDA § 3.5.

As noted above, the term "affiliate" is defined as "any existing or future corporation, firm, limited liability company, partnership, or other entity that directly or indirectly controls, or is controlled by, or is under common control with a Party to this Agreement." Id. § 1.1. "Control," in turn, is defined as:

[O]wnership, directly or through one or more Affiliates, of fifty percent (50%) (or such lesser percentage which is the maximum allowed to be owned by a foreign entity in a particular jurisdiction) or more of the shares of stock entitled to vote for the election of directors in the case of a corporation, or fifty percent (50%) (or such lesser percentage which is the maximum allowed to be owned by a foreign entity in a particular jurisdiction) or more of the equity interests in the case of any other type of legal entity, or status as a general partner in any partnership, or any other arrangement whereby a Party controls or has the right to control the board of directors or equivalent governing body of a corporation or other entity.

Id.

It is undisputed that Groupe Limagrain Holding SA owns a majority of the stock of both Vilmorin and LCI. See Corporate Disclosure Statement Pursuant to Federal Rule of Civil Procedure 7.1 of Defendants Vilmorin & Cie and Limagrain Céréales Ingrédients SA, ECF No. 20. It is also undisputed that LCI came

10

to own a majority of the stock of Arista in 2017. See
Declaration of Eric Vaschalde in Support of Defendant Arista
Cereal Technologies Pty Limited's Motion to Dismiss the
Complaint Pursuant to Rules 12(b)(1), 12(b)(2) and 12(b)(6)
("Vaschalde Decl."), ECF No. 26, at ¶ 2. Accordingly, Arcadia
argues, Vilmorin and Arista came under common control at least
as early as 2017, and Arista thereby came to be an affiliate
bound by the NDA, including the forum selection clause.
Plaintiff's Memorandum of Law in Opposition to Arista Cereal
Technologies Pty Limited's Motion to Dismiss for Lack of
Personal Jurisdiction under Fed.R.Civ.P. 12(b)(2), Lack of
Subject Matter Jurisdiction under Fed.R.Civ.P. 12(b)(1), and
Failure State a Claim under Fed.R.Civ.P. 12(b)(6), at 3-5
("Arcadia A-Opp."), ECF No. 40.[3]

Arcadia is undoubtedly correct that the NDA, by its terms,
purports to bind not just existing affiliates, but also entities
that become affiliates of Vilmorin's in the future. NDA §§ 1.1,

---

[3] Arcadia has also suggested that Arista became an "affiliate" of
Vilmorin's earlier than 2017 because LCI has maintained a
"substantial continuous ownership interest" in Arista and
therefore might have "control[led] or ha[d] the right to
control" Arista prior to 2017. Arcadia A-Opp. 6. But the terms
of the NDA make clear that LCI would have had to "control[] or
ha[ve] the right to control [Arista's] board of directors or
equivalent governing body" in order to make Arista an affiliate
of Vilmorin's, NDA § 1.1, and Arcadia has made no showing, not
even a prima facie showing, to this effect.

3.5. The Court must determine, however, whether the enforcement of the NDA's forum selection clause against a party that was not an affiliate of the parties to the NDA at the time it was signed comports with New York contract law (which governs the NDA) and federal due process. The Court holds that it does not.

Beginning with New York contract law, it is axiomatic that "[a] contract cannot bind a non-party unless the contract was signed by the party's agent, the contract was assigned to the party, or the signatory is in fact the 'alter ego' of the party." Glob. Entm't, Inc. v. New York Tel. Co., No. 00 Civ. 2959 (SHS), 2000 WL 1672327, at *7 (S.D.N.Y. Nov. 6, 2000). Even where an "agreement purport[s] to bind successors and assigns of the parties to the agreement, an assignee or successor will not be bound to the terms of a contract absent an affirmative assumption of the duties under the contract." Amalgamated Transit Union Local 1181, AFL-CIO v. City of New York, 846 N.Y.S.2d 336, 338 (2nd Dep't 2007); see Todd v. Krolick, 466 N.Y.S.2d 788, 789 (3rd Dep't 1983), aff'd, 466 N.E.2d 149 (N.Y. 1984) ("Even though the subject contract purports to bind any successors to the property, it is clear that the assignee of rights under a bilateral contract is not obligated to perform

12

the duties under the contract unless he expressly assumes to do so.").[4]

Here, Arcadia has made no allegations that Vilmorin acted as Arista's agent or alter ego when signing the NDA. Nor has Arcadia alleged that Vilmorin assigned the NDA to Arista, let alone that Arista affirmatively assumed the NDA's duties. Instead, Arcadia has cited several cases for the proposition that contracting parties can bind future affiliates, notwithstanding the rule against binding non-parties. The two such cases with the greatest bearing on the Court's analysis are VKK Corp. v. National Football League, 244 F.3d 114 (2d Cir. 2001), and Ellington v. EMI Music, Inc., 21 N.E.3d 1000 (N.Y. 2014).

In VKK, the owners of the New England Patriots brought an antitrust suit against the NFL and other defendants for allegedly preventing plaintiffs from relocating the Patriots

---

[4] There are exceptions to the rule that a party cannot bind its successor, but none of them is relevant here, as Arista is not Vilmorin's successor. See Am. Buying Ins. Servs., Inc. v. S. Kornreich & Sons, Inc., 944 F. Supp. 240, 249 (S.D.N.Y. 1996) ("In general, successor liability will lie when: (1) there is an express or implied agreement to assume the other company's debts and obligations; (2) the transaction was fraudulent; (3) there was a de facto merger or consolidation of the companies; or (4) the purchasing company was a mere continuation of the selling company.").

outside of New England.[5] 244 F.3d at 118. The district court
granted summary judgment for defendants on the grounds that
plaintiffs had signed a release of all claims against
defendants. Id. at 121. As relevant here, the release stated
that plaintiffs:

> hereby release and forever discharge the National
> Football League, its officers, directors, ... employees,
> subsidiaries, affiliates, partners, predecessors,
> principals, heirs, executors, administrators, trustees,
> beneficiaries, agents, successors, and assigns, and each
> Member Club of the National Football League ... their
> officers, directors ... subsidiaries, affiliates,
> partners, predecessors, principals, heirs, executors,
> administrators, trustees, beneficiaries, agents,
> successors, and assigns ... of and from any and all past
> or present or, if based, in whole or in part, on facts,
> actions, claims or matters existing or occurring from
> the beginning of the world to the date of this Release,
> future claims.

Id. at 130.

The Second Circuit vacated the grant of summary judgment in
part, holding that two of the defendants – entities involved in
starting the Jacksonville Jaguars[6] – had not been members of the
NFL at the time plaintiffs signed the release, and therefore

---

[5] It seems apparent that, while New Englanders may love their
Patriots, the team's ownership is more concerned with profits
than with loyalty to their fans. As any former fan of the
Brooklyn Dodgers will recognize, this is fully in keeping with
the American spirit of free enterprise.

[6] Whether the good citizens of Jacksonville have any deep-seated
loyalty to a team that has never made it to the Superbowl is a
question beyond the scope of this Opinion.

were subject to suit. Id. The court explained that nothing in the release language above indicated an intent to release future member clubs, and that "[t]he NFL and its member clubs are sophisticated commercial actors who could have specifically referred to future member clubs had they intended to include them in the Release." Id.

As should be evident from this brief summary, VKK has no bearing on the instant case. The court did not hold that any non-parties were bound by the release. Nor did the court hold that non-parties could be bound by the release. Instead, the court held that plaintiffs were not bound by the release and could accordingly bring suit against non-parties. The court also stated that plaintiffs could have bound themselves such that they were precluded from bringing suit against non-parties. But again, this would have been an obligation that was binding on plaintiffs, not on the non-parties.

Ellington is similarly unhelpful to Arcadia's position. In that case, the heir of jazz legend Duke Ellington[7] brought an action against defendant EMI Music, Inc. for royalties allegedly due under a copyright renewal agreement. 21 N.E.3d at 1001. Under the agreement, Ellington and certain family members were

---

[7] This Court candidly admits that it has a greater love for Duke Ellington than for any NFL team.

15

designated as the "First Parties," while EMI's predecessor in
interest, Mills Music, Inc., "and any other affiliate of Mills
Music, Inc.," were designated as the "Second Party." Id. The
agreement gave the Second Party the right to renew the copyright
for certain compositions by Ellington, but it also "require[d]
the Second Party to pay the First Parties a sum equal to fifty
(50%) percent of the net revenue actually received by the Second
Party from foreign publication of the relevant musical
compositions." Id. at 1002.

    After the agreement was executed, EMI became affiliated
with foreign subpublishers that retained 50% of the royalties
generated from foreign sales, and EMI remitted half of the other
50% (25% of the total royalties) to the First Parties. Id.
Plaintiff sued for breach of contract and fraudulent
concealment, arguing that EMI should be required to remit 50% of
the total royalties generated from foreign sales by its
affiliated foreign subpublishers, not just 50% of the half that
EMI received from the foreign subpublishers. Id.

    The New York Supreme Court granted EMI's motion to dismiss,
and the Appellate Division and Court of Appeals affirmed. Id. at
1002-03, 1005. First, the Court of Appeals held that the
language of the agreement required EMI to remit only "net
revenue actually received . . . from foreign publication,"

16

whereas "the percentage retained by the affiliated foreign subpublishers is not an amount actually received by EMI." Id. at 1004.

Next, the court rejected the argument that the affiliated foreign subpublishers were members of the "Second Party" because they fell within the definition of "any other affiliate of Mills Music, Inc." Id. "Absent explicit language demonstrating the parties' intent to bind future affiliates of the contracting parties," the court stated, "the term 'affiliate' includes only those affiliates in existence at the time that the contract was executed." Id. (citing VKK, 244 F.3d at 130-131). "If the parties intended to bind future affiliates," the court continued, "they would have included language expressing that intent. Absent such language, the named entities and other affiliated companies of EMI's predecessor which existed at the time are bound by the provision, not entities that affiliated with EMI after execution of the Agreement." Id.

At oral argument in the instant case, counsel for Arcadia cited the above language from Ellington to support its conclusion that Arista was bound to the NDA as a future affiliate. See Transcript dated January 7, 2019 at 9:20-11:9. But the better reading of the Ellington court's statements is that "explicit language demonstrating the parties' intent" was

17

necessary to bind future affiliates, not that it was sufficient. As discussed above, there are cases in which parties can bind non-parties to a contract, such as when the parties are agents of the non-parties. It seems clear that the court in Ellington was contemplating such cases, rather than introducing a new rule of contract law that would give contracting parties broad discretion to bind non-parties. Indeed, in explaining why EMI's predecessor did not include language in the agreement that would have bound future affiliates, the trial court stated that the predecessor "could not represent that [it] had the authority to bind entities that did not yet exist or were not yet affiliated with" it. Ellington v. EMI Music, Inc., 939 N.Y.S.2d 740, 2011 WL 4907781, at *5 (N.Y. Sup. Ct. 2011). As there is no evidence that Arcadia had the authority to bind Arista to the NDA, Ellington has no bearing on this case.[8]

Arcadia's fallback position is that, even if the above decisions (and others cited by Arcadia[9]) do not support the

---

[8] Another reason that Ellington has no bearing on this case is that the plaintiff in Ellington sought to enforce the agreement only against EMI, not against the foreign subpublishers. In the instant case, by contrast, Arcadia seeks to enforce the NDA against Arista.

[9] Arcadia also cites Wellington Shields & Co. v. Breakwater Inv. Mgmt. LLC, No. 14-cv-7529 (RJS), 2016 WL 5414979 (S.D.N.Y. Mar. 18, 2016), Georgia Malone & Co. v. E & M Assocs., 81 N.Y.S.3d 387 (1st Dep't 2018), and Credit Index, L.L.C. v. RiskWise

18

general enforcement of contracts against future affiliates, a
separate line of cases authorizes the enforcement of forum
selection clauses against non-signatories. In the Second
Circuit, this line started with Aguas Lenders Recovery Group v.
Suez, S.A., in which the court held that, "for the purposes of
the doctrine of forum non conveniens, a non-signatory to an
agreement may be bound by a forum selection clause and forum non
conveniens waiver contained in contracts entered into by an
entity alleged to be a predecessor in interest." 585 F.3d 696,
697 (2d Cir. 2009). Notably, the court in Aguas assumed that the
defendant – against which enforcement was sought – was bound by
"successorship doctrine"[10] to its predecessor's contractual
obligations. "[I]f successorship doctrine binds a non-signatory
to the obligations of a contract," the court reasoned, "such a

Int'l, L.L.C., 746 N.Y.S.2d 885 (N.Y. Sup. Ct. 2002). None of
these cases supports Arcadia's position. Wellington Shields,
like Ellington, stated only that it was necessary for
contracting parties to expressly indicate their intent to bind
future affiliates, not that it was sufficient for them to do so.
2016 WL 5414979, at *6. Similarly, Georgia Malone held only that
it was ambiguous whether the contracting parties there had
intended to bind future affiliates. 81 N.Y.S.3d at 394-96. And
Credit Index is inapposite because it involved a non-party that
was aware of the contract at issue and then wholly acquired one
of the contracting parties. 746 N.Y.S.2d at 887-89.

[10] Although the court did not define "successorship doctrine," it
appears to have contemplated those situations discussed in
footnote 4 above. See 585 F.3d at 701 (citing United States v.
Mexico Feed & Seed Co., 980 F.2d 478, 487 (8th Cir. 1992)).

non-signatory/successor is . . . subject to the . . .
presumption of the enforceability of mandatory forum selection
clauses." Id. at 700-01. The court stated that it saw "no reason
to treat forum selection provisions differently from other
contractual obligations," and it noted "ample support for the
conclusion that the fact a party is a non-signatory to an
agreement is insufficient, standing alone, to preclude
enforcement of a forum selection clause." Id. at 701 (collecting
cases).

Clearly, Aguas stands for the narrow proposition that a
non-signatory can be bound by forum selection provisions to the
same extent that it can otherwise be bound to a contract under
standard principles of contract law. But, as discussed above,
Arcadia has failed to show how Arista can be bound to the NDA
under such principles. However, the Aguas court also cited with
approval several decisions from other circuits (and not
involving New York law) addressing additional situations in
which forum selection clauses may be enforced against non-
signatories. As relevant here, the Ninth Circuit in TAAG Linhas
Aereas de Angola v. Transamerica Airlines, Inc. held that
defendants could enforce a forum selection clause against a non-
signatory plaintiff who was a third-party beneficiary to a
contract. 915 F.2d 1351, 1354-55 (9th Cir. 1990). And the Eighth

20

Circuit in Marano Enterprises of Kansas v. Z-Teca Restaurants, L.P. held that defendants could enforce a forum selection clause against a non-signatory plaintiff who was "'closely related' to the disputes arising out of the agreements." 254 F.3d 753, 757 (8th Cir. 2001). A non-signatory was determined to be "closely related," in turn, if it was "foreseeable that it [would] be bound" to a forum selection clause. Id.

That a forum selection clause can be enforced against a non-signatory plaintiff who is a third-party beneficiary is consistent with the general "law of contracts, which has long recognized that third-party beneficiary status does not permit the avoidance of contractual provisions otherwise enforceable." Coastal Steel Corp. v. Tilghman Wheelabrator Ltd., 709 F.2d 190, 203 (3d Cir. 1983), overruled on other grounds by Lauro Lines s.r.l. v. Chasser, 490 U.S. 495 (1989). Similar logic may justify the enforcement of forum selection clauses against "closely related" non-signatory plaintiffs, as these parties' interests are often "completely derivative of those of the [signatory] plaintiffs — and thus directly related to, if not predicated upon the interests of the [signatory] plaintiffs." Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285, 1299 (11th Cir. 1998).

Some lower courts, however, have extended the above line of cases and held that forum selection clauses can be enforced against "closely related" non-signatory defendants, even where those defendants object to the exercise of personal jurisdiction. See, e.g., LaRoss Partners, LLC v. Contact 911 Inc., 874 F. Supp. 2d 147, 154-61 (E.D.N.Y. 2012); Metro-Goldwyn-Mayer Studios Inc. v. Canal & Distribution S.A.S., No. 07 Civ. 2918 (DAB), 2010 WL 537583, at *4-5 (S.D.N.Y. Feb. 9, 2010). This Court is not persuaded to follow suit.

Aguas, after all - and the cases cited therein - involved motions to dismiss based on grounds of improper venue and forum non conveniens, not motions to dismiss for lack of personal jurisdiction. The rules governing the former class of motions are driven primarily by concerns for the "convenience of litigants and witnesses," Denver & R. G. W. R. Co. v. Bhd. of R. R. Trainmen, 387 U.S. 556, 560 (1967), as well as by a range of "private and public interests," Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru, 665 F.3d 384, 389 (2d Cir. 2011). Accordingly, these motions require courts to weigh multiple factors and - particularly in the case of the doctrine of forum non conveniens - "retain flexibility." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 249 (1981).

22

The rules governing personal jurisdiction, by contrast, are driven by constitutional concerns over "the court's power to exercise control over the parties." Leroy v. Great W. United Corp., 443 U.S. 173, 180 (1979). Although the personal jurisdiction inquiry is not mechanical, it is constrained in ways that the venue inquiry is not. Most notably, a plaintiff must make a baseline showing that the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). Regardless of the convenience to the parties or the private and public interests at stake, a court cannot exercise personal jurisdiction unless "the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958).

These constitutional requirements caution against a liberal application of forum selection clauses to non-signatory defendants. In cases following Aguas, the application of forum selection clauses to non-signatories has been justified by various policy benefits, including "the contribution that such clauses have been praised for making to certainty in commercial

23

transactions," "the salutary effect of dispelling any confusion about where suits arising from the contract must be brought and defended," the promotion of "vital interests of the justice system, including judicial economy and efficiency," and the guarantee "that parties will not be required to defend lawsuits in far-flung fora." Magi XXI, Inc. v. Stato della Citta del Vaticano, 714 F.3d 714, 722 (2d Cir. 2013).[11] But although these benefits may be salutary, a court cannot consider them without first determining whether the exercise of jurisdiction over the defendant comports with due process.

As noted above, due process requires that a defendant have "minimum contacts" with the forum state. "In judging minimum contacts, a court properly focuses on the relationship among the defendant, the forum, and the litigation." Calder v. Jones, 465 U.S. 783, 788 (1984). "[T]he relationship must arise out of contacts that the defendant himself creates with the forum State," not "contacts between the plaintiff (or third parties) and the forum State." Walden v. Fiore, 571 U.S. 277, 284 (2014).

Here, Arcadia has shown no connection between Arista and New York. Arista is an Australian joint venture that was formed

---

[11] In Magi, the Second Circuit held that "a non-signatory to a contract containing a forum selection clause may enforce the forum selection clause against a signatory when the non-signatory is 'closely related' to another signatory." 714 F.3d at 723 (emphasis added).

24

by LCI – a French company – and two Australian entities. FAC
¶ 5. It has no offices, employees, or bank accounts in New York,
has entered into no pre-litigation contracts in New York, and
has never sold any products in New York. Vaschalde Decl. ¶¶ 3-4.
The only "contact" Arcadia has established is a 2009 NDA that
was signed by a company whose sister company became a majority
owner of Arista's stock eight years later, in 2017. This is too
thin a reed on which to rest the Court's exercise of personal
jurisdiction.

    As a final point, even if the Court were less hesitant to
enforce forum selection clauses against "closely related" non-
signatory defendants, it would hold that enforcement against
Arista is unwarranted here. As noted above, a non-signatory is
"closely related" to a signatory if "enforcement of the forum
selection clause is foreseeable by virtue of the relationship
between the signatory and the [non-signatory] sought to be
bound." Metro-Goldwyn-Mayer Studios Inc., 2010 WL 537583, at *5.
But Arcadia has made no showing that enforcement of the NDA's
forum selection clause was foreseeable in light of Arista's
relationship with Vilmorin. Arcadia has not even made a showing
that Arista was aware of the forum selection clause. To the
contrary, Arcadia and Arista entered into a separate
confidentiality agreement – governed by Australian law – that

                                25

covered similar subject matter over a similar time period to the
NDA between Arcadia and Vilmorin. Vaschalde Decl. ¶ 8. Given
these facts, it seems implausible that Arista would have
foreseen enforcement of the NDA's forum selection clause.[12]

For the foregoing reasons, Arista's motion to dismiss for
lack of personal jurisdiction is granted, and all claims against
Arista are dismissed without prejudice to being reinstated in a
forum that can exercise personal jurisdiction over Arista.

## II. **Vilmorin and LCI's Motion to Dismiss for Failure to State a Claim**

Vilmorin and LCI move to dismiss the FAC under Rule
12(b)(6) of the Federal Rules of Civil Procedure. To survive a
motion to dismiss under Rule 12(b)(6), a plaintiff must "state a
claim to relief that is plausible on its face." Ashcroft v.
Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial
plausibility when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." Id. When
adjudicating a motion to dismiss, the Court "accept[s] all
factual allegations in the complaint and draw[s] all reasonable

_____

[12] Furthermore, as this Court explained in Miller v. Mercuria
Energy Trading, Inc., non-signatories are less likely to be
"closely related" to signatories where their connection – like
Vilmorin and Arista's – is horizontal rather than vertical. 291
F. Supp. 3d 509, 524 (S.D.N.Y. 2018).

inferences in the plaintiff's favor." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

Arcadia brings claims against Vilmorin and LCI for breach of contract, breach of the implied covenant of good faith and fair dealing, unfair competition, misappropriation of confidential information, unjust enrichment, conversion, and tortious interference. FAC ¶¶ 111-74. For the reasons discussed below, the Court holds that each of these claims is either time barred or insufficiently pled. Accordingly, the Court will grant Vilmorin and LCI's motion to dismiss the FAC with prejudice.

## A. Breach of Contract

"To state a claim in federal court for breach of contract under New York law, a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996). Here, Arcadia alleges that Vilmorin and LCI breached the NDA through "the taking, misuse and disclosure of" confidential information related to Arcadia's high amylose wheat invention. FAC ¶ 114. Under the NDA, "a receiving Party shall not disclose to any third party except as expressly provided herein Confidential Information received hereunder, and shall not use Confidential Information received hereunder except for

27

the Purpose identified above." NDA § 3.1. The Purpose, in turn, is defined in Recital C of the NDA as "discussions regarding a potential strategic business relationship between [Vilmorin and Arcadia], the scope of which may ultimately include technical and/or financial due diligence by one or both Parties."

Arcadia alleges that defendants have breached the NDA in two ways. First, Arcadia alleges, defendants misused and disclosed confidential information by claiming it in Arista's patents. FAC ¶ 52. Second, Arcadia alleges, even outside of Arista's patents, defendants have misused and disclosed confidential information in order "to support and further the launch of Defendants' commercial products." Id. ¶ 115.

Defendants respond that Arcadia's breach of contract claim is time barred. Memorandum of Law in Support of Defendants Vilmorin & Cie and Limagrain Cereales Ingredients SA's Motion to Dismiss 8-13 ("VL MTD"), ECF No. 28. Under New York's borrowing statute, defendants argue, Arcadia's claims must be timely under both the six-year limitations periods imposed by New York (the forum state) and the four-year limitations period imposed by California (Arcadia's principal place of business, where the cause of action accrued). Id. at 9; see N.Y. C.P.L.R. 202 ("An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by

28

the laws of either the state or the place without the state where the cause of action accrued . . . ."). Given that Arcadia's breach of contract claim is untimely under either state's limitations period, defendants argue, the claim must be dismissed. VL MTD 12-13.

As a preliminary matter, Arcadia argues that New York's statute of limitations, not its borrowing statute, applies because the NDA specifies that it "shall be governed by and construed in accordance with the laws of New York, without giving effect to the principles of conflict of laws." Plaintiff's Memorandum of Law in Opposition to Vilmorin & Cie's and Limagrain Cereales Ingredients SA's Motion to Dismiss Complaint 11 ("Arcadia VL-Opp."), ECF No. 42. Arcadia argues that "there is, at a minimum, a question of fact as to whether the parties intended CPLR § 202 to apply to actions brought to enforce the NDA Agreement since there is a discrepancy between the application of New York statutes of limitations pursuant to New York law and application of the borrowing statute." Id.

The Court disagrees with Arcadia that there is a question of fact as to the parties' intent. As the New York Court of Appeals has repeatedly stated, "the best evidence of what parties to a written agreement intend is what they say in their writing." 2138747 Ontario, Inc. v. Samsung C & T Corp., 103

N.E.3d 774, 777 (N.Y. 2018). Here, the parties agreed that the NDA would "be governed by and construed in accordance with the laws of New York." NDA § 7. And the laws of New York include New York's borrowing statute.

It is true that the NDA's choice-of-law provision also states that the NDA will be governed and construed "without giving effect to the principles of conflict of laws." Id. But as the Court of Appeals has recently explained, there is "a 'significant difference' between . . . common-law conflicts principles and a statute of limitations issue governed by the CPLR, including CPLR 202." 2138747 Ontario, 103 N.E.3d at 779. Indeed, "CPLR 202 is in derogation of the long-standing common-law conflicts principle that the law of the forum applies to procedural issues such as the statute of limitations." Id.

More generally, recent Court of Appeals decisions make clear that the question of whether to give effect to conflict-of-laws principles when evaluating a choice-of-law provision bears primarily on the substantive law that a court applies, not the procedural law. See id. at 380; Ministers & Missionaries Ben. Bd. v. Snow, 45 N.E.3d 917, 920-21 (N.Y. 2015); IRB-Brasil Resseguros, S.A. v. Inepar Investments, S.A., 982 N.E.2d 609, 612 (N.Y. 2012). And there is no question that "CPLR 202 is an

30

abiding part of New York's procedural law." 2138747 Ontario, 103
N.E.3d at 777.

Accordingly, in order for Arcadia's breach of contract
claim to be timely under New York's borrowing statute, it must
be timely under both New York's and California's statutes of
limitations. Under California law, a claim for breach of
contract must be brought within four years. Cal. Civ. Proc. Code
§ 337(a). Furthermore, "[a] cause of action for breach of
contract accrues at the time of the breach of contract, and the
statute of limitations begins to run at that time regardless of
whether any damage is apparent or whether the injured party is
aware of his right to sue." Perez-Encinas v. AmerUs Life Ins.
Co., 468 F. Supp. 2d 1127, 1134 (N.D. Cal. 2006). However,
"[u]nder the 'discovery rule' recognized by California courts, a
cause of action accrues when the plaintiff discovers or could
have discovered, through the exercise of reasonable diligence,
all of the facts essential to his cause of action." Id.

Here, defendants argue that Arcadia knew or should have
known about defendants' alleged breach when Arista's patent
applications were published. VL MTD 12-13. As such, defendants
argue, the latest Arcadia's cause of action could have accrued
was February 13, 2014, when Arista's third patent application
was published. Id. at 13. Given that Arcadia filed suit over

31

four years later, on September 4, 2018, their breach of contract claim is barred under California law, and thus under New York's borrowing statute. Id.

Arcadia responds that its claim is timely, even under California's statute of limitations, because "the FAC alleges breaches of the NDA . . . as recently as 2018." Arcadia VL-Opp. 4. As noted above, Arcadia alleges that defendants have breached the NDA both by misusing and disclosing confidential information claimed in Arista's patents, FAC ¶ 52, and by misusing and disclosing other confidential information "to support and further the launch of Defendants' commercial products," id. ¶ 115. Arcadia argues that this latter category of misuse and disclosure occurred within the statute of limitations, but that because "details on exactly when Defendants misused the specific technical information disclosed by Arcadia is only known to Defendants . . . factual disputes as to the date of accrual exist, and . . . discovery is necessary." Arcadia VL-Opp. 5.

It would make a mockery of statutes of limitations, however, if one could avoid them simply by speculating as to what subsequent discovery might turn up. Here, the FAC does not offer a single non-conclusory example of how defendants misused and disclosed confidential information that was not claimed in Arista's patents. Furthermore, when pressed at oral argument for

specifics, Arcadia's counsel was unable to provide any. Transcript dated January 7, 2019 at 28:23-33:8. The FAC does purport to define the kinds of confidential information that were shared with defendants but were not claimed in Arista's patents. FAC ¶ 59. But when it comes to defendants' alleged misuse and disclosure of this information, the FAC says only that "Arcadia believes that Defendants are . . . misusing and misappropriating this . . . information for Defendant's business activities," and that "[r]eview of Defendants' internal research and development records, which will be the subject of discovery in this action, will be necessary to determine the full scope and timing of these additional misuses." Id. This is a classic fishing expedition, and it is insufficient to place defendants' alleged conduct within California's statute of limitations.

Because Arcadia's breach of contract claim is untimely under California law, it is also untimely under New York's borrowing statute. Furthermore, even if New York's statute of limitations applied, Arcadia's claim would be barred. "New York has a six-year statute of limitations for breach-of-contract claims," and "[t]he limitations period begins to run when the cause of action accrues." Marvel Worldwide, Inc. v. Kirby, 756 F. Supp. 2d 461, 470 (S.D.N.Y. 2010). "A breach-of-contract

cause of action accrues and the limitations period begins to run when the breach occurs." Id.

Here, Arcadia alleges that "Defendants breached their non-use obligations under the NDA . . . by no earlier than when the Arista Patent Applications were filed." FAC ¶ 88. As described above, Arista's '884 Application, '177 Application, and '456 Application were filed on November 4, 2011, November 2, 2012, and August 6, 2013, respectively. Id. ¶ 15. If the filing of each of these applications started a new six-year limitations period, then breach of contract claims associated with the filing of the '177 and '456 Applications would be timely, as these applications were filed within six years of the complaint.

However, as defendants argue, each of these applications was preceded by a provisional or Patent Cooperation Treaty ("PCT") application filed outside the statute of limitations: the '177 Application was preceded by provisional applications filed on November 4, 2011 and May 10, 2012, and the '456 Application was preceded by a provisional application filed on November 4, 2010 and a PCT application filed on November 4, 2011. VL MTD 6. Defendants argue that any confidential information allegedly misused or disclosed in preparing the later applications was also allegedly misused or disclosed in preparing the earlier applications, and that Arcadia's breach of

34

contract claim accrued when defendants "first pursued [their] patent applications." Id. at 10 (citing Ferring B.V. v. Allergan, Inc., 932 F. Supp. 2d 493, 505 (S.D.N.Y. 2013)).

Arcadia responds that its breach of contract claim did not accrue with the filing of the provisional and PCT applications because one of the provisional applications in question – the one filed on November 4, 2010 – did not reference "point mutations," which are central to Arcadia's invention. Arcadia VL-Opp. 12. Arcadia also argues that "a provisional patent application only serves to establish a precursor for a priority date, [and] it alone cannot result in any patent rights." Id.

But as defendants explain in their reply brief, the provisional application filed on November 4, 2010 is only one of four provisional and PCT applications that precede the '177 and '456 Applications and that were filed outside the statute of limitations. Reply Memorandum of Law in Further Support of Defendants Vilmorin & Cie and Limagrain Cereales Ingredients SA's Motion to Dismiss 4, ECF No. 47. These other applications make myriad references to "point mutations," id., and Arcadia has offered no other response to defendants' argument that any confidential information allegedly misused or disclosed in preparing the later applications was also allegedly misused or disclosed in preparing these earlier applications. Furthermore,

35

it is immaterial that the provisional and PCT applications did
not "result in any patent rights," Arcadia VL-Opp. 12, as the
relevant issue to Arcadia's breach of contract claim is whether
the filing of the applications involved the misuse or disclosure
of confidential information.

For all of the foregoing reasons, the Court holds that
Arcadia's breach of contract claim is time barred. Accordingly,
the claim will be dismissed with prejudice.

## B. Breach of the Implied Covenant of Good Faith and Fair
## Dealing

"Under New York law, parties to an express contract are
bound by an implied duty of good faith, but breach of that duty
is merely a breach of the underlying contract." Harris v.
Provident Life & Acc. Ins. Co., 310 F.3d 73, 80 (2d Cir. 2002).
"A claim for breach of the implied covenant will be dismissed as
redundant where the conduct allegedly violating the implied
covenant is also the predicate for breach of covenant of an
express provision of the underlying contract." Id.

Arcadia alleges that defendants breached the implied
covenant of good faith and fair dealing by, inter alia, "(i)
taking and misusing the Arcadia Invention disclosed by Arcadia
to Defendants under the NDA Agreement; (ii) prosecuting at least
the '177 Application and the '456 Application based on the

36

Arcadia Invention; and (iii) working to develop commercial products using Arcadia Confidential Information in violation of Arcadia's rights." FAC ¶ 121.

As defendants explain in their motion to dismiss, Arcadia's breach of implied covenant claim is time barred for the same reasons as its breach of contract claim. VL MTD 12-13. Under both California and New York law, the statutes of limitations for breach of contract and breach of implied covenant are the same. See Perez-Encinas, 468 F. Supp. 2d at 1133-34; V.E.C. Corp. of Delaware v. Hilliard, 896 F. Supp. 2d 253, 259 (S.D.N.Y. 2012). And, as defendants note, the crux of both "claims is that Defendants breached the 2009 NDA by improperly using and disclosing information about the Arcadia Invention in order to prepare and file patent applications in Arista's name." VL MTD 10.

Furthermore, even if the claim were not time barred, the Court would dismiss it as duplicative. Under New York law, a claim for breach of the implied covenant of good faith and fair dealing "will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for a claim for breach of covenant of an express provision of the underlying contract." In re Houbigant Inc., 914 F. Supp. 964, 989 (S.D.N.Y. 1995).

Arcadia argues that its implied covenant claim "rest[s] on conduct in addition to and outside of the obligations on which the breach of contract claim is based." Arcadia VL-Opp. 16. Specifically, Arcadia argues that certain alleged conduct, such as defendants' "filing and prosecuting patent applications[,] is not expressly addressed in the terms of the NDA." Id. at 17. Instead, Arcadia argues, "under the implied covenant of good faith and fair dealing, implied in terms of the NDA Agreement would be an understanding that neither party to that agreement should file and prosecute patent applications claiming information disclosed by the other party." Id.

The Court finds Arcadia's argument unpersuasive. Although the NDA did not explicitly contemplate the filing and prosecuting of patent applications, it prohibited the disclosure of confidential information "except as expressly provided herein," and it prohibited the use of confidential information "except for the Purpose identified above." NDA § 3.1. Neither of these exceptions can reasonably be construed to allow for the filing and prosecution of patent applications that rely on confidential information shared among the parties. Accordingly, the Court finds that the conduct underlying Arcadia's implied covenant claim is the same as the conduct underlying its contract claim.

38

For all these reasons, Arcadia's breach of implied covenant claim will be dismissed with prejudice.

## C. Unjust Enrichment

"The elements of unjust enrichment are that the defendants were enriched, at the plaintiff's expense, and that it is against equity and good conscience to permit the defendants to retain what is sought to be recovered." Cty. of Nassau v. Expedia, Inc., 992 N.Y.S.2d 293, 296 (2nd Dep't 2014). Unjust enrichment claims are "available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." Corsello v. Verizon New York, Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012). "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Id. Accordingly, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." Clark-Fitzpatrick, Inc. v. Long Island R. Co., 516 N.E.2d 190, 193 (N.Y. 1987).

Arcadia alleges that, "[w]hen the Arista Patents issued, Defendants received a benefit from Arcadia in their improper

39

taking, possession and use of the Arcadia Invention, which is the property of Arcadia." FAC ¶ 143. Similarly, Arcadia alleges that, "[w]hen Defendants developed commercial products by taking advantage [of] Arcadia Confidential Information, Defendants received a benefit from Arcadia in their improper taking, possession and use of the Arcadia Confidential Information, which is the property of Arcadia." Id. Arcadia also alleges that defendants "are using the Arcadia Confidential Information disclosed to them under the NDA Agreement, not all of which is incorporated into the claims of the Arista Patents, to further their own commercial development and unfairly compete with Arcadia, thereby gaining improper commercial advantage at the expense of Arcadia and in violation of Arcadia's rights." Id. ¶ 144.

Defendants respond, as they did in the context of Arcadia's breach of implied covenant claim, that Arcadia's unjust enrichment claim is both time barred and duplicative of its breach of contract claim. VL MTD 8-13, 14-16. For substantially the same reasons as those discussed above, the Court agrees on both fronts. Accordingly, Arcadia's unjust enrichment claim will be dismissed with prejudice.

**D. Misappropriation of Confidential Information**

"To state a claim for misappropriation of confidential
information, a plaintiff must allege that the defendant used the
plaintiff's confidential information for the purpose of securing
a competitive advantage. Where the plaintiff and defendant are
both parties to a contract, the plaintiff must allege a breach
of a duty independent of the duties under the contract." Reed
Const. Data Inc. v. McGraw-Hill Companies, Inc., 745 F. Supp. 2d
343, 352 (S.D.N.Y. 2010).

Arcadia alleges that defendants "are using the Arcadia
Confidential Information disclosed to them under the NDA
Agreement, not all of which is incorporated into the claims of
the Arista Patents, to further their own commercial development
and unfairly compete with Arcadia, thereby gaining improper
commercial advantage at the expense of Arcadia and in violation
of Arcadia's rights." FAC ¶ 132. For example, Arcadia alleges,
"Defendants' use and disclosure of that information through
their filing of at least the utility patent applications leading
to the '722 Patent and the '413 Patent breached their duty of
confidentiality arising out of their relationship with Arcadia."
Id. ¶ 137. In addition, Arcadia alleges "[u]pon information and
belief" that "Defendants have also misappropriated Arcadia
Confidential Information disclosed under the NDA Agreement that
is not specifically claimed in the Arista Patents." Id.

41

Defendants argue that Arcadia's misappropriation claim –
like the claims above – is both time barred and duplicative.
With respect to the statute of limitations, defendants argue
that the claim is time barred because "misappropriation claims
must be brought within three years of when the defendant
discloses the trade secret or when he first makes use of the
plaintiff's ideas." Ferring, 4 F. Supp. 3d at 628. Given
Arcadia's allegation that defendants misappropriated its
confidential information "through their filing of at least the
utility patent applications leading to the '722 Patent and the
'413 Patent," FAC ¶ 137, and given that the last of these
applications was filed in 2013, defendants argue that the
statute of limitations ran in 2016, VL MTD 17.

Defendants also argue that Arcadia's misappropriation claim
is duplicative of its breach of contract claim. Id. Under New
York law, defendants argue, repackaging contract claims as tort
claims is "generally precluded, unless based on a duty
independent of the contract." Bancorp Servs., LLC v. Am. Gen.
Life Ins. Co., No. 14-cv-9687 (VEC), 2016 WL 4916969, at *9
(S.D.N.Y. Feb. 11, 2016). Here, defendants argue, Arcadia has
alleged no duty of confidentiality independent of the
contractual duties imposed by the NDA. VL MTD 18.

42

With respect to defendants' argument that Arcadia's claim is time barred, Arcadia responds that its misappropriation claim is "based on Defendants' misuse of the Arcadia Invention and Arcadia Confidential Information to gain an improper commercial advantage at the expense of Arcadia and in violation of Arcadia's rights." Arcadia VL-Opp. 14. Arcadia argues that "[t]his conduct occurred as recently as 2018 when Defendants, among other things, interfered with Arcadia's anticipated business relationship with Bay State Milling and through Defendants' public statements and business activities." Id.

And with respect to defendants' argument about duplication, Arcadia responds that its "misappropriation claim is not duplicative of its breach of contract claim because it alleges that Defendants have taken affirmative steps beyond the requirements of the contract to harm Arcadia." Id. at 21. By misusing Arcadia's confidential information for their own commercial advantage, Arcadia argues, defendants violated a "duty of confidentiality to Arcadia, which arose because of the relationship between the parties and Defendants' knowledge as to the source of that information." Id. at 22.

As above, the Court finds Arcadia's responses unpersuasive. With respect to the statute of limitations issue, the Court has already determined that Arcadia has not adequately alleged

43

misuse of confidential information outside of the filing of Arista's patents. The Bay State Milling allegation, which is discussed below in the context of Arcadia's tortious interference claim, does not change this conclusion. And with respect to Arcadia's argument that defendants had an independent duty of confidentiality, this duty is exactly the duty that was codified in the NDA. Any allegations of misappropriation are thus duplicative of Arcadia's breach of contract claim.

Given that it is both duplicative and time barred, Arcadia's misappropriation claim will be dismissed with prejudice.

### E. Unfair Competition

"The essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 34 (2d Cir. 1995). "In a common law unfair competition claim under New York law, the plaintiff must show either actual confusion in an action for damages or a likelihood of confusion for equitable relief." Id. at 35. "Additionally, there must be some showing of bad faith." Id.

Arcadia alleges that defendants have unfairly competed by "misrepresenting themselves as the sole inventors and the sole owners of the Arcadia Invention," and by "improperly using the Arcadia Invention and Arcadia Confidential Information communicated to Defendants in violation of Arcadia's rights." FAC ¶ 125. For example, Arcadia alleges that defendants "are actively seeking to dissuade commercial partners from doing business with Arcadia," id., and are causing "industry and consumer confusion by misrepresenting themselves as the inventors and owners of the inventions claimed in the Arista Patents and through developing products taking advantage of Arcadia Confidential Information disclosed under the NDA," id. ¶ 127.

The parties' arguments regarding Arcadia's unfair competition claim largely mirror those regarding Arcadia's misappropriation claim. As relevant here, defendants argue that the three-year statute of limitations on Arcadia's unfair competition claim has run. VL MTD 19; see Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co., 126 F. App'x 507, 509 (2d Cir. 2005) ("The statute of limitations for an unfair competition claim based on misappropriation of another's labors or expenditures is three years."). Arcadia responds that its unfair competition

45

claim is timely for the same reasons as its misappropriation claim. Arcadia VL-Opp. 14-15.

As in the case of Arcadia's misappropriation claim, the Court agrees with defendants that Arcadia's unfair competition claim is time barred. Accordingly, the unfair competition claim will be dismissed with prejudice.

### F. Conversion

Under New York law, "conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." Colavito v. New York Organ Donor Network, Inc., 860 N.E.2d 713, 717 (N.Y. 2006). "Generally, only tangible property can be the subject of a conversion action, but intangible rights can form the basis of conversion damages when the converted property is a document into which intangible rights have merged." Ancile Inv. Co. v. Archer Daniels Midland Co., 784 F. Supp. 2d 296, 312 (S.D.N.Y. 2011).

Arcadia alleges that, "when the Arista Patents were assigned in whole to Arista, Defendants converted Arcadia's property." FAC ¶ 151. Arcadia also alleges that defendants "are using the Arcadia Confidential Information disclosed to them under the NDA Agreement, not all of which is incorporated into

46

the claims of the Arista Patents, to further their own commercial development and unfairly compete with Arcadia, thereby gaining improper commercial advantage at the expense of Arcadia and in violation of Arcadia's rights." Id. ¶ 154.

Defendants make several arguments for dismissal. As relevant here, defendants argue that Arcadia's "conversion claim should be dismissed because it is premised upon the alleged misuse of intangible property." VL MTD 22. In response, Arcadia argues that electronic data can be the subject of a conversion claim, see Thyroff v. Nationwide Mut. Ins. Co., 864 N.E.2d 1272, 1278 (N.Y. 2007), and that Arcadia's intellectual property can therefore be the subject of a conversion claim because it "was transmitted to [defendants] in powerpoint presentations and through detailed disclosures of technical information." See Arcadia VL-Opp. 22-23.

Arcadia is correct that "electronic records that [are] stored on a computer and [are] indistinguishable from printed documents . . . [are] subject to a claim of conversion in New York." Thyroff, 864 N.E.2d at 1278. However, as the courts in Harris v. Coleman, 863 F. Supp. 2d 336 (S.D.N.Y. 2012), and Grgurev v. Licul, 229 F. Supp. 3d 267 (S.D.N.Y. 2017), have thoughtfully explained in the intellectual property context,

47

there is a difference between an electronic record of an intangible interest and the intangible interest itself.

In Harris, the court considered a conversion counterclaim based on allegations that the PTO's record of patent ownership for a given patent had been transferred by a fraudulent assignment document. 863 F. Supp. 2d at 344-45. The court noted that intangible property was not traditionally subject to conversion claims, but that New York courts had recently "extended the tort of conversion to some intangible property rights that are merged in, or identified with, some document or relate to specifically identifiable money." Id. at 344. Because defendant's counterclaim was for conversion of the PTO's record, the court held that the counterclaim could proceed. Id. at 345. The same conclusion would not have followed, however, if the counterclaim had been for the patentable idea itself.

The court considered a similar issue in Grgurev and held that misappropriation of a trademark could not support a conversion claim under New York law. 229 F. Supp. 3d at 286-87. The court acknowledged that "an action for conversion involving intangible property may be sustained when, in reality, it involves the misappropriation of tangible property that manifests intangible intellectual property, such as . . . the USPTO's record of patent ownership." Id. at 286 (citing Harris,

48

863 F. Supp. 2d at 345). However, given that the trademark at issue was "not tangible personal property, but rather [wa]s intangible intellectual property having no existence apart from the good will of the product or service it symbolize[d]," the court held that its misappropriation could not ground a conversion claim. Id. at 286-87.

The Court finds the above cases to be persuasive and holds that Arcadia cannot bring a claim for conversion of its intellectual property. The instant case is not analogous to Harris, as there is no allegation that a (paper or electronic) record of Arcadia's ownership was in some way misappropriated by defendants. Accordingly, Arcadia's conversion claim is dismissed with prejudice.

## G. Tortious Interference

"Under New York law, recovery of damages for tortious interference with prospective economic advantage must be based on a factual showing that: (i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 214 (2d Cir. 2002).

Arcadia alleges that defendants "have improperly publicly promoted their false and deceptive assertion of sole ownership of the inventions claimed in one or more of the Arista Patents (or aspects thereof) to discourage potential business partners from working with Arcadia to develop, license, and/or launch commercial products." FAC ¶ 164. Furthermore, Arcadia alleges, "Defendants have interfered with Arcadia's commercial relations and prospective business advantage by using, among other things, one of more of the issued Arista Patents to dissuade growers, mills, and other development and commercial[] partners from working with Arcadia." Id. ¶ 167. Arcadia alleges specifically that, "in 2018 Defendants interfered with Arcadia's efforts to reach a commercial agreement with Bay State Milling," and that "Arcadia had an opportunity and expectation of entering into an agreement with Bay State Milling, but for this improper interference." Id. ¶ 95.

Defendants argue that Arcadia's tortious interference claim fails for several reasons. As relevant here, defendants argue that Arcadia fails to allege that it "would have entered into an economic relationship but for [Defendants'] wrongful conduct." Vilmorin and LCI Supplemental Letter Brief 5, ECF No. 37 (quoting Knight-McConnell v. Cummins, No. 03 Civ. 5035 (NRB), 2004 WL 1713824, at *4 (S.D.N.Y. July 29, 2004)). Arcadia

50

responds that it has adequately alleged causation because the FAC alleges that "Arcadia had an opportunity and expectation of entering into an agreement with Bay State Milling, but for [defendants'] improper interference." FAC ¶ 95; Arcadia VL-Opp. 24 n.8.

The Court finds Arcadia's allegations inadequate. It is true that Arcadia alleges that it "had an opportunity and expectation of entering into an agreement with Bay State Milling, but for [defendants'] improper interference." FAC ¶ 95. But even this allegation falls short of claiming that Arcadia would have entered into a contract with Bay State Milling absent defendants' interference. More important, Arcadia's allegation is entirely conclusory, as the FAC provides no further factual allegations to substantiate the assertion.

Accordingly, the Court holds that Arcadia's tortious interference claim is dismissed with prejudice.

## Conclusion

For the foregoing reasons, the Court hereby grants Arista's motion to dismiss for lack of personal jurisdiction, and it also grants Vilmorin and LCI's motion to dismiss for failure to state a claim. All of Arcadia's claims against Arista are dismissed without prejudice to refiling in a court that has jurisdiction

51

over Arista, but all of Arcadia's claims against Vilmorin and LCI are dismissed with prejudice.

The Clerk is directed to close the entries at docket numbers 23 and 27, and to enter final judgment dismissing the First Amended Complaint.

SO ORDERED.

Dated:   New York, NY

         January 25, 2019                JED S. RAKOFF, U.S.D.J.